NEW YORK CLOTHING MANUFACTURERS' EXCHANGE, INC., and Others, Plaintiffs, *v.* TEXTILE FINISHERS ASSOCIATION, INC., and Others, Defendants.

First Department, June 2, 1933.

*Max Leff* of counsel [*Jerome R. Hellerstein* with him on the brief; *Drechsler & Leff*, attorneys], for the plaintiffs.

*F. H. LaGuardia* of counsel [*Paul J. Kern* with him on the brief; *F. H. LaGuardia*, attorney], for the defendants.

MERRELL, J. The plaintiffs herein, with the exception of New York Clothing Manufacturers' Exchange, Inc., are each of them engaged in the business of manufacturing men's clothing in the city of New York. The plaintiff New York Clothing Manufacturers' Exchange, Inc., is a membership corporation of which the other plaintiffs are members. Each of the defendants, other than the defendant Textile Finishers Association, Inc., is engaged in the business of shrinking woolen cloths in the city of New York. The Textile Finishers Association, Inc., is a membership corporation, the other defendants being members of said corporation.

The defendants, on or about September 1, 1932, entered into an agreement among themselves by the terms of which they each agreed that on and after said date they should each charge manufacturers of clothing for the performance of the various processes carried on by said defendants an amount stated and agreed upon by said defendants, and that none of the defendants should accept goods required for examination, sponging, shrinking, decating, london or water shrinking, and refinishing from any clothing manufacturer for whom said defendant had not been performing such processes on and prior to September 1, 1932, and that in such case where two or more of the defendants had been doing examining, sponging, shrinking, decating, london or water shrinking, and refinishing for a clothing manufacturer on and prior to September 1, 1932, that on and after said date such spongers should divide among themselves all the moneys thereafter received from such clothing manufacturer for examining, sponging, shrinking, decating, london or water shrinking, and refinishing in the proportion in which such spongers had been performing such processes for such clothing manufacturers prior to September 1, 1932. The minimum prices to be charged for the various services performed by the defendants are set forth in the submission of controversy entered into by the parties hereto.

It is the contention of the plaintiffs that the agreement entered into by and between the defendants is illegal under the provisions of the common law as against public policy and is violative of the provisions of section 340 of the General Business Law, known as the Donnelly Act. It is the contention of the plaintiffs that the contracts, agreements, arrangements and practices of the defendants, as set forth in the agreement entered into by and between them, tend to create a monopoly in this State in the examining, sponging, shrinking, decating, london or water shrinking, and refinishing of fabrics, and that such contract and agreement restrains and prevents competition in this State in supply and price, and restricts and prevents a free pursuit in this State of such business, and that

said contracts, agreements, arrangements and practices are against public policy, illegal and void. The defendants deny such claim and assert that such contracts, agreements, arrangements and practices are legal and valid.

The controversy submitted for our determination is whether or not, on the stipulated facts, the plaintiffs are entitled to judgment declaring that the contracts, agreements, arrangements and practices aforesaid create or tend to create a monopoly in this State in the examining, sponging, shrinking, decating, london or water shrinking, and refinishing of fabrics, and restrain and prevent competition in this State in the supply and price thereof, and restrict and prevent the free pursuit in this State of the business thereof and are for the purpose of establishing a monopoly in such activities, and are against public policy, and illegal and void. The plaintiffs ask that the defendants and each of them be restrained and enjoined from continuing the contracts, agreements, arrangements and practices hereinbefore mentioned. The defendants contend that they are entitled to judgment declaring the aforesaid contracts, agreements, arrangements and practices to be legal and valid, and that the defendants have the right to continue the same in the conduct of their business. The parties agree that this court shall render such judgment as shall be proper on the stipulated facts, but without costs.

Prior to organization of the Textile Finishers Association, Inc., the shrinking business in the city of New York was competitive. Each defendant accepted piece goods for shrinking from any clothing manufacturer offering the same, without regard as to whether the clothing manufacturer was then or prior thereto had been doing business with any other shrinker, and each defendant accepted goods for shrinking from the clothing manufacturer at such prices as were agreed upon without regard to what other defendants were charging or other clothing manufacturers were paying for similar services. About 38,000,000 yards of woolen cloth are used each year in the manufacture of men's clothing in the city of New York. Of this amount the members of the plaintiff exchange used about 24,000,000 yards annually. The woolen cloth is purchased by clothing manufacturers in lengths of substantially sixty yards each, known as piece goods. Before these goods are cut into patterns for the manufacture of clothing they are subjected to the following processes: *First*, examined as to defects; *second*, sponging or shrinking, sometimes involving double sponging or shrinking; decating; london or water shrinking; and, finally, refinishing. The purpose of these processes is to so shrink the fabrics that they may be manufactured into garments without further shrinkage. About one per cent of the New York city clothing manufacturers shrink their own piece goods,

selling some 6,000,000 yards of cloth each year. About 1,000,000 yards are pre-shrunk, and, therefore, it is unnecessary to subject them to any of the processes mentioned. The balance, of about 31,000,000 yards, is shrunk by concerns engaged in the cloth shrinking business. These concerns are known as examiners, spongers, shrinkers or finishers. The shrinking of cloth is a relatively simple process by the application to the cloth of live steam. The cloth is placed upon perforated cylinders, and live steam is then applied, and, in some instances, water, so that the fabric is properly shrunk. Each shrinking establishment performs all of the processes mentioned, and maintains the necessary machinery, appliances, equipment and plant therefor. The spongers also supply their own conveyances to receive and deliver goods, for the purpose of performing the aforesaid processes. The defendants, together, have a capacity and facilities for and do approximately eighty per cent of all the shrinking of woolen cloths in the city of New York. When goods are brought to a shrinker they are, first, examined, which involves the measurement of the cloth, inspecting it for imperfections, and indicating the presence of the latter. In the sponging process the cloth is rolled on perforated cylinders in which live steam is forced until the cloth is thoroughly saturated. It is then rolled on wooden spindles. The decating process is performed practically on the same principle as double sponging, except that the cloth is rolled into an apron mantle which is steamed, together with the goods, and except that the heat is extracted quickly to prevent blistering or cockling of the goods. In london or water shrinking the cloth is separated by layers of wet blanket, after which the cloth is pressed either by hand or by hydraulic process. The refinishing process consists of pressing the cloth in a hydraulic press, after it has been sponged or shrunk.

It is the contention of the defendants that their organization was formed and the agreement entered into between them to cure serious and existing evils in their business. The processes carried on by the defendants are for the benefit not only of the manufacturers of the cloth, but for the protection of consumers against shrinking and warping of the garments after purchase. It appears that prior to the organization of the defendant Textile Finishers Association, Inc., and the making of the agreement here under consideration, the industry in which the defendants were engaged became badly demoralized. Among the faults sought to be remedied by the defendants was the false certification of shortages or defects in fabrics which in many instances had been exacted from the sponger, which shortages and defects were sufficient in many instances to pay for the entire cost of examining and shrinking.

It is claimed that often the exactions of such manufacturers became so unreasonable as to demand false certification of inferior quality in order to avoid fulfillment of contracts between customers and woolen mills, and that as a result and the bearing down on the price for services rendered by the defendants through keen competition in their industry, and the existence of strong associations in the clothing industry, the defendants' industry became exceedingly unstable. In order to meet the terms demanded by the industry it is stated in the defendants' brief that spongers at times would resort to the practice known as " clipping," which meant to cut off the ends of bolts of cloth, the shortage being accounted for as natural shrinkage, and the clips sold. " Fences " for the reception of such unlawfully and improperly obtained goods were established, and such pieces sold to unscrupulous manufacturers of caps and boys' pants, and that labor was compelled to participate in such practices. By reason of the rate for services becoming so low as to make workmanlike and technically perfect services most difficult or impossible, insolvencies frequently resulted. Such was the condition of the industry when it is claimed by the defendants their association was formed at the direct behest of a committee of employers and a committee of employees. It is the contention of the defendants that through the improper leadership before referred to the charter of the shopmen had been withdrawn by the American Federation of Labor, and that the president of the American Federation of Labor undertook to improve the conditions and to that end the defendant Textile Finishers Association, Inc., was organized and the agreement now sought to be restrained was entered into. The defendants assert that as the result of the organization of their corporation and the agreement aforesaid, great improvement in conditions has resulted. Among them, that insurance against theft, at one time impossible at any rate, now covers every delivery vehicle in the industry, and that the rates are being constantly reduced as the result of the improvements of the risk; that during the past year there has not been a single case of theft of goods from trucks; that fraud is now a rare exception, and that demands for improper certification by customers are not only ignored and refused, but reported to the impartial chairman of the organization. Honest manufacturers of clothing are protected against unscrupulous manufacturers who heretofore obtained unfair advantage through improper shortages and unconscionable rebates on textiles and sponging services. It is asserted that labor conditions have been improved by the defendant association. An unemployment insurance fund has been set up and all employees and employers contribute five and two and one-half per cent respectively of their payrolls to

such fund; that the union pays death benefits to workers; and that efforts are now under way to stabilize the business and eliminate as much as possible its seasonal character — efforts which will never succeed without the unselfish co-operation of the customers of the examiners and shrinkers — the plaintiffs in this proceeding.

We are of the opinion that the defendant organization and the agreements entered into by its members are not illegal under the common law and are not against public policy, and that the agreement does not come within the inhibition of section 340 of the General Business·Law. The legality of the agreement here under attack is supported by a very recent decision of the United States Supreme Court, handed down on March 13, 1933. The opinion in that case (*Appalachian Coals, Inc.,* v. *United States,* 288 U. S. 344) was written by Chief Justice HUGHES. The Appalachian Coals, Inc., entered into an agreement which was claimed to be in violation of the so-called Sherman Anti-Trust Act. The United States Supreme Court held that the Appalachian Coals, Inc., an association of coal producers controlling sixty-four per cent of commercial production of Appalachian coal and seventy-four and four-tenths per cent of the production of the area covered by the agreement with relation to the sale of coal in the markets, was not acting illegally. The Appalachian coal field is one of the largest and most important in the United States, producing almost one-fourth of the bituminous coal in the United States east of the Mississippi. The Appalachian Coals, Inc., was a voluntary corporation and under its agreement no coercive steps were indulged for the purpose of procuring members, but if the association succeeds in dominating the marketing of coal it will have a virtual monoply, as coal mining property is limited geographically. If the defendant association is permitted to continue, there never can be any domination to the extent of a monopoly since the capital investment required to engage in the business is small and the required equipment can be purchased on the open market without restraint. In the *Appalachian Coals* case the association fixed the price of all coal sold by its members (having an exclusive selling agency) and agreed to sell " at the best prices obtainable," whereas the defendant association does not fix the prices of individual members and does not have any exclusive selling contract with its members. After a careful survey of the actual cost of services rendered by its members it has promulgated a minimum price schedule based on such actual cost, in an effort to prevent competitive conditions from forcing its members to operate at a loss and to prevent reduction from the basic wage scale. In the *Appalachian* case the association

agreed, so far as possible, to " sell the coal of the Producer in the markets to the same customers * * * that the Producer has heretofore sold such coal." This tends to prevent competition for customers, which is further prevented by the exclusive selling agreement. In the agreement now before us the association agrees that customers may not transfer without cause from one shrinker to another, but that upon cause shown and with the consent of the impartial chairman, customers may transfer their accounts at will. No complaint is made of any arbitrary action of the impartial chairman in this case. In the *Appalachian* case the members agreed to submit their controversies to an arbitration board. In the case under the agreement before us the members agreed to submit the controversies to the impartial chairman. In the *Appalachian* case if a member breached the agreement by selling coal otherwise than as directed by the association, he is liable for damages to the association, fixed at the commission of ten per cent plus the difference between the price received by the member and the price paid by the association. In the agreement before us if a member engages in unfair practices or is guilty of fraud, deception or cheating any customers, he is subject to a fine by the impartial chairman. Fines are fixed substantially in the same manner and to the same amount as in the Appalachian agreement, except that the association, being entitled to no selling commission, receives no damages for loss of same.

In passing upon the validity of the Appalachian Coals, Inc., contract, Chief Justice HUGHES, in the course of his opinion, had this to say: " Good intentions will not save a plan otherwise objectionable, but knowledge of actual intent is an aid in the interpretation of facts and prediction of consequences. *Chicago Board of Trade* v. *United States* [246 U. S. 231]. The evidence leaves no doubt of the existence of the evils at which defendants' plan was aimed. The industry was in distress. It suffered from over-expansion and from a serious relative decline through the growing use of substitute fuels. It was afflicted by injurious practices within itself — practices which demanded correction. If evil conditions could not be entirely cured, they at least might be alleviated. The unfortunate state of the industry would not justify any attempt unduly to restrain competition or to monopolize, but the existing situation prompted defendants to make, and the statute did not preclude them from making, an honest effort to remove abuses, to make competition fairer, and thus to promote the essential interests of commerce. The interests of producers and consumers are interlinked. When industry is grievously hurt, when producing concerns fail, when unemployment mounts and communities dependent

upon profitable production are prostrated, the wells of commerce go dry. So far as actual purposes are concerned, the conclusion of the court below was amply supported that defendants were engaged in a fair and open endeavor to aid the industry in a measurable recovery from its plight." Justice HUGHES further stated that the stabilizing of the industry by correcting abuses was not necessarily an unreasonable restraint of trade. In this respect he stated: "As we stated at the outset, the question under the act is not simply whether the parties have restrained competition between themselves, but as to the nature and effect of that restraint."

" We agree that there is no ground for holding defendants' plan illegal merely because they have not integrated their properties and have chosen to maintain their independent plants, seeking not to limit but rather to facilitate production. We know of no public policy, and none is suggested by the terms of the Sherman Act, that in order to comply with the law those engaged in industry should be driven to unify their properties and businesses in order to correct abuses which may be corrected by less drastic measures."

We are of the opinion that this very recent decision in the *Appalachian Coals* case, in its application of the rule of reason to an honest effort to improve the conditions of industry, holding that the agreement there is entirely legal and proper, affords strong support to the agreement here under consideration.

We do not think that the agreement entered into between the defendants is violative of section 340 of the General Business Law (the Donnelly Act). In the first place, any clothing manufacturer has an entire right, if he desires, not only to do his own shrinking, but may employ other shrinkers than the defendants. There is no possibility, under this contract, of the creation of a monopoly. The Donnelly Act is directly aimed against the formation of a monopoly in the manufacture, production or sale of any article or product used in the conduct of trade, commerce or manufacture or of any article or commodity of common use. In our view, the activities of the defendants can, in no sense, be regarded as dealing in a product or commodity. The defendants' activities are solely services which they render in the examination and preparation of woolen goods for use in the clothing manufacturing trade. We think the Donnelly Act has no application whatever to the situation here presented. The business of the defendants is quite similar to that carried on by the Fur Dressers' and Fur Dyers' Association, involved in the case of *United States* v. *Fur Dressers' & Fur Dyers' Assn.* (5 F. [2d] 869). The defendants in that case were indicted under the Federal anti-trust laws charging restraint of interstate trade in fur skins. The work of the fur dresser was to remove the

meat from raw furs and to clean the same, and the dyers to dye the fur. In holding that there was no restraint of trade in the agreement entered into by the fur dressers and fur dyers the court said, among other things: " The defendants neither buy nor sell furs. They only dress and dye furs belonging to others at their places of business. Dyeing and dressing furs do not constitute trade or commerce, but only the performance of labor." So here, the examining and shrinking of woolen cloth does not involve the purchase or sale thereof, and does not constitute trade or commerce in the cloth. Only the performance of services is involved. We think this agreement is valid as an agreement for the rendition of services, and that it is in no sense in restraint of trade, as used in the statutory enactments or at common law. The defendant association is no more than an attempt at economic regulation. As in cases involving the Sherman Act, so as to the provisions of the Donnelly Act, the rule of reason has been applied. In *Barns* v. *Dairymen's League Co-operative Assn., Inc.* (220 App. Div. 624) the court stated: " I am convinced that our courts, like the United States Supreme Court since the decisions in *Standard Oil Co. of N. J.* v. *United States* (221 U. S. 1) and *Locker* v. *American Tobacco Co.* [121 App. Div. 443; affd., 195 N. Y. 565] will apply the ' rule of reason ' to every combination or agreement brought before them. Before it will condemn, there must appear the elements of injury to the public, or monopolistic control of a particular article of commerce, or unreasonable interference with and damage to the business of an individual, or the doing of illegal or unconscionable acts, or specific intent to do injury to someone else or, in brief, at least some of the circumstances which would lead a court in good conscience to say that a given set of defendants were overstepping the bounds of reasonable ambition and fair play and were becoming a nuisance to their fellow men." And Justice HUGHES, in the *Appalachian Coals* case, had this to say: " In applying this test, a close and objective scrutiny of particular conditions and purposes is necessary in each case. Realities must dominate the judgment. The mere fact that the parties to an agreement eliminate competition between themselves is not enough to condemn it." The regulations of the defendants do not fix a definite scale of prices, but merely fix a minimum price.

We are, therefore, of the opinion that the organization of the defendant association and the agreement entered into by the defendants was not an illegal one, and that, therefore, the plaintiffs are not entitled to judgment declaring the contracts and agreements aforesaid and the practices of the defendants to be illegal, and that the

defendants should not be restrained from continuing the contracts, agreements, arrangements and practices hereinbefore mentioned.

We think the defendants are entitled to judgment declaring the aforesaid contracts, agreements, arrangements and practices to be legal and valid, and that the defendants have a right to continue the same in the conduct of their business.

Judgment should, therefore, accordingly be rendered in favor of the defendants, without costs.

FINCH, P. J., O'MALLEY, SHERMAN and TOWNLEY, JJ., concur.

Judgment directed in favor of the defendants, without costs. Settle order on notice.