LAZARUS SAINER, Plaintiff, *v.* AFFILIATED DRESS MANUFACTURERS INC., and Others, Defendants.

Supreme Court, Special Term, Bronx County, July 7, 1938.

*Abraham Sainer* [*Herman L. Sainer* of counsel], for the plaintiff.

*Emil Schlesinger* and *Abraham Schlesinger,* for the defendants International Ladies' Garment Workers' Union and Joint Board of Dress and Waist Makers' Union of Greater New York.

LEVY, J. Plaintiff has brought this action for a declaratory judgment. After answering, practically all the defendants have moved for judgment on the pleadings under rule 112 of the Rules of Civil Practice while the plaintiff attacks the sufficiency and relevancy of the defenses. Of course, if the defendants prevail in their effort, the disposition of the other motions will become unnecessary. Three of the defendants are incorporated associations referred to briefly as " Affiliated," " National " and " Popular," whose members are known in the dress industry as jobbers. The fourth is an incorporated association, referred to briefly as " United," whose members, including the plaintiff, are known as dress contractors. The two remaining defendants are unincorporated associations, referred to briefly as the " Union." Their members, it is said, constitute 100 per cent of the employees engaged in the manufacture of ladies' ready-to-wear dresses by the dress jobbers and contractors, who, it is also claimed, manufacture all of the dresses in New York city and environs within a radius of fifty miles. Some of the jobbers maintain inside shops, but most of them let the bulk of their labor to the contractors.

Early in 1936 the defendants entered into collective agreements, which were to run for a period of three years, and which among other things provided for the stabilization of hours of work, rate of wages and working conditions. Dresses were to be manufactured for members of the " Affiliated," " National " and " Popular " only by members of " United," while the latter was to manufacture exclusively for members of the jobbers' associations. Likewise the jobbers and contractors were to employ exclusively members in good standing of the " Union," while the latter were to engage

in manufacture exclusively for members of " Affiliated," " National," " Popular " and " United." The terms of the agreement here are only superficially alluded to in the complaint, but one branch of it entitled " Designation of Contractors " is annexed as Exhibit A, upon which plaintiff predicates his particular grievance. He seemingly accepts the summarized portion of the collective contract as fair but desires a declaration that the section dealing with " Designation of Contractors " is illegal and contrary to public policy. The criticized portion opens in the following language: " A. For the purpose of eliminating substandard conditions in the dress industry, and to aid in the stabilization thereof, and for the further purpose of properly enforcing the terms and provisions contained in this agreement, the parties hereto agree that every member of the AFFILIATED who deals with or gives work to contractors, shall confine his production to his inside shop, if he maintains one, and to the number of contractors actually required by him to manufacture his garments, who have been designated by him in the manner hereinafter provided, and that such contractors shall work only for members of the AFFILIATED designating them."

Identical provisions are contained in the counterparts of the agreement affecting " National " and " Popular " so that all three associations of jobbers are similarly bound. The exhibit also recites provisions relating to the Administrative Board and Administrator or Impartial Chairman, whose functions are detailed in the agreement. It continues with an outline of the system of appointment or designation of contractors. All contractors registered as such by a member of a jobber association shall be deemed a permanent contractor provided he continues to conduct a union shop. The registration of such permanent contractor shall be with the Administrative Board. A member shall have the right to designate an additional contractor, provided his inside shop is fully supplied with work and actually requires an outside contractor because of an increased volume of business. Such designation is secured by means of the jobber's written application to the Administrative Board for its approval. If a member does not maintain an inside shop and there is insufficient work for all his contractors he must distribute the work equitably among them on the basis of the number of machine operators employed. If he maintains an inside shop and there is insufficient work he must also pro rate the work equitably to and among the operators of his shop and the permanent contractors in his service. Provision is made for a change of contractors by the jobber upon approval of the Administrative Board. A member is also given the right to discharge a contractor for

cause upon complaint to the Administrative Board and the Impartial Chairman, which shall review its propriety. A contractor shall work exclusively for the jobber designating him unless otherwise approved by the Administrative Board and he is not to distribute garments, directly or indirectly, to any other contractor, jobber, wholesaler, retailer or consumer. After the date of the agreement no jobber who sends all his work to contractors, shall open an inside shop in his premises or enlarge it, unless by consent of the Administrative Board. Jobbers, however, shall have the right to employ cutters, sample makers and others to work on completed garments. Moreover, after the date of the agreement no contractor shall enlarge his factory by employing a greater number of machine operators without the consent and approval of the Administrative Board.

These provisions in Exhibit A have been stated rather fully because the complaint declares them to be violative of section 340 of the General Business Law, commonly known as " The Donnelly Anti-Trust Act." That statute declares against public policy, illegal and void every agreement whereby " competition or the free exercise of any activity in this state in the manufacture, production, transportation, marketing or sale in this state or in the supply or price of any such article, product, commodity, service, transportation or trade practice is or may be restrained or prevented." By a specific provision incorporated by later amendment the article does not apply to contractors of cooperative associations of farmers, gardeners, or dairymen, " nor to bona fide labor unions."

It is plaintiff's grievance that he was registered as an authorized contractor under Exhibit A with certain jobbers who are no longer in business, and that he could not obtain registration for work with other concerns, although several member jobbers are said to be ready, willing and able to engage him. He states as the reason for this failure that, while he made the request, the Administrative Board has arbitrarily and wrongfully refused such registration. Thus, since the terms of the agreement prevent him from contracting with persons who, apparently, are able and willing to employ him, the wilful conduct of the Administrative Board has, it is claimed, virtually established a monopoly of the business from which plaintiff is suffering irreparable damage. Further, while the present agreement expires early in 1939, the defendants threaten to extend it for an additional period of years. Although plaintiff alleges he has no adequate remedy at law he seeks no relief other than the declaration that the portion of the agreement contained in Exhibit A is illegal.

It may be repeated that plaintiff does not object to the collective agreements generally, but only to those features which govern the designation of contractors. He does not present the entire agreement but only that part which he desires to have declared illegal and in restraint of trade. However, the complete agreement has been made a part of the answer. It need hardly be observed that a declaration of rights cannot justly or intelligently be made without a consideration of the full contract. The criticized fragment may appear to be violative of plaintiff's rights. If, however, it is read together with the context of which it is but a part, it may not only become proper but also confirm and strengthen the rights of labor sought to be protected in the other parts. His summary, however, is not a safe guide, particularly since reference in his complaint to parts of the very Exhibit A is contrary to its expressed language. In this connection it undoubtedly becomes important to refer to the fifteenth paragraph of the pleading, which complains of the requirement that no member of the jobbers' associations may engage any contractor unless the latter obtains permission from the Administrative Board. Plaintiff continues in the sixteenth paragraph to assert that he has attempted to obtain work from the jobbers, several of whom manifested a willingness to furnish him some provided he secured registration with the Administrative Board, which the latter had denied him. The procedure which he followed, evidently without success, is directly contrary to that outlined in the provisions of Exhibit A. It was not for him to obtain registration, but for a jobber to seek it in his behalf. The language of this exhibit indicates clearly that the jobber shall make written application for the contractor to the Administrative Board.

While plaintiff alleges that he has duly performed, yet his specific averments do not support the general one. This defect alone might be said to justify the granting of the motion, but in view of the larger issues of public interest I hesitate to rest my disposition upon such a circumstance. At all events this might properly be the subject of but a simple amendment. I shall therefore enter upon the more serious questions raised.

Two problems suggest themselves. Does the agreement including the part complained of pertain to "bona fide labor unions?" Secondly, if not, does it offend the Donnelly Anti-Trust Act? In *American Fur Mfrs. Asso.* v. *Associated Fur Coat Trimming Mfrs.*, 161 Misc. 246, affd., 251 App. Div. 708, the controversy was between an employers' association as plaintiff and another association joined with labor unions as defendants. It was urged in the complaint that the effect of a certain collective agreement between the defendants was to create a monopoly. The court held that the agreement

pertained to a labor union and as such was cloaked with immunity by virtue of subdivision 2 of section 340, and added: " If the contract be held legal as to the defendant labor unions, it must, likewise, be held valid as to the defendant association. The contract cannot be effective as to one signatory and ineffective as to the other. If a labor union is legally entitled to enter into the agreement here assailed, such privilege would be wholly illusory if the contract were to be held invalid as to the other contracting party."

Obviously, in an industry comprised of small units of employers effective collective agreements can be obtained only if the trade union deals with the employers through an association. This method of dealing has the advantage of avoiding a multiplicity of negotiations at every step and enabling a better enforcement of, and respect for, the very collective agreement not alone by the union, but through the discipline which the association exercises upon its individual members. (*American Cloak and Suit Mfrs. Assn.*, v. *Brooklyn L. G. M. Assn.*, 143 Misc. 319.) The collective arrangements under consideration are tripartite affairs involving employers, sub-employers or contractors, and employees-members of labor unions. They involve necessarily not only relations between the employers and sub-employers on the one hand and the labor unions on the other, but they also define relations between the employers and the sub-employers, and the definition of the status of one toward the other inevitably affects the provisions for the protection of the interest of union labor. It is therefore almost unavoidable that the portion of the collective agreement which deals merely with the relations between employers and sub-employers is an integral part of the contract involving a bona fide labor union. As such, on its face, it must be presumed to be exempt from the prohibitions of section 340 of the General Business Law.

The plaintiff argues that the mere signature by a labor union to an agreement does not necessarily render it one dealing with a labor union within the meaning of the statute. Conceivably such a document, ostensibly having to do with labor problems or conditions, might well be employed as a subterfuge with the design to cloak it wickedly with a measure of statutory protection. The difficulty, however, in applying the statute to the situation here disclosed is, that admittedly the collective agreements deal with hours, wages, working problems and conditions. Even assuming that provisions might have been engrafted with the motive of giving to them the character of a labor contract, plaintiff, nevertheless, has utterly failed to show any such purpose. Exhibit A, even if it be conceded that it tends to effect the mischief complained of, cannot be judged, as already observed, except in the light of the agreement as a whole. It is not difficult to extract an onerous condition from a collective

agreement and argue that when so isolated it has no relation to a labor contract although in fact it is a part of one. It may, however, be an indispensable *quid pro quo* for the conditions essentially protective of labor. These observations must illustrate the impossibility of properly passing upon clauses torn from their context, in order to decide whether they are incorporated unnecessarily or with ulterior motive in a labor contract, so as to achieve immunity for it from the operation of section 340. In any event, the burden would seem to be on the plaintiff to make a clear statement of ultimate facts in his pleading to overcome the presumption that such clauses are a necessary part of such an agreement. Generalities as to the allegedly oppressive character of a specific clause are wholly insufficient.

The maintenance of an action for a declaratory judgment is addressed to the sound discretion of the court. Even if an adequate remedy by other forms exists, such an action will, at proper times, be entertained. In the instant case the plaintiff, who expresses an individual grievance, seeks a ruling upon the validity of a contract which he fails to present except in a fragmentary way. If he has any cause as to unjust discrimination, arbitrary treatment, or perchance, conspiracy, he has his remedy by appropriate action. Instead he demands a declaratory judgment without consequential relief. He is a lone member of the association who is seeking to destroy the agreement, rather than individual redress. He seems to be eager for the aid of the court in his effort, perhaps unwittingly, to introduce unrest in the industry and thus encourage persons who might otherwise be satisfied to also attempt to annul the contract. Such a course is not in the interest of industrial peace, and the court in its discretion will not lend its assistance.

It may not be inappropriate to observe that I have carefully weighed the provisions quoted in Exhibit A. The stated purpose of eliminating sub-standard conditions in the dress industry, to aid in its stabilization, and to enforce the terms and conditions of the collective agreement, are all consistently carried out by the specific provisions suitable to those ends. They are not foreign to the usual provisions of collective labor agreements, but on the contrary seem, even when superficially read, designed to promote better conditions. Lack of stability among the contractors and the jobbers means industrial unrest, possible unemployment, glut in one part of the industry and famine in the other. In these days of depression, there is a predominating desire to promote an equitable distribution of work where there is insufficient for all. The inevitable result of the assailed provisions is the introduction of a share-the-work plan which is bound to be advantageous to the workers in the industry.

A similar issue was presented in *National Dress Mfrs. Assn.*, v. *United Assn. of Dress Mfrs.*, 151 Misc. 327. There, I referred sympathetically to the plight of defendant dress contractors which occasioned the unfair competition and deprived them of a fair return on their undertakings, and then observed that " these grievances are not irremediable and must yield to larger interests of a group of perhaps 40,000 wage earners who are not merely innocent third parties, but to whom the very defendant is pledged by solemn agreement to prevent lockouts." As a phase in a plan for distributing the burden of unemployment by sharing work, the feature complained of would surely be a part of a labor contract and as such exempted from the operation of section 340. But even if it were not it might still have the effect of unobjectionable regulation to stabilize the industry. In *New York Clothing Mfrs. Exchange* v. *Textile Finishers Assn.*, 238 App. Div. 444, defendants entered into an agreement whereby they agreed upon fixed prices for various services and for other methods of conducting business. The clothing manufacturers sought to have the agreement declared illegal on the ground that it did violence to the provisions of the Donnelly Act in that it created a monopoly in the examining and sponging of fabrics, prevented competition and restricted free pursuit of trade. The controversy was submitted to the Appellate Division upon an agreed statement of facts. The court held the agreement was not contrary to public policy and quoted from the opinion of Chief Justice HUGHES in *Appalachian Coals Inc.* v. *United States*, 288 U. S. 344, which upheld trade regulations by an association, although they did have the tendency, to a certain extent, to fix prices so as to prevent competitive conditions from forcing members to operate at a loss and to reduce the basic wage scale. The following quotation by Mr. Justice MERRELL from the opinion of the Chief Justice is quite apt:

" The evidence leaves no doubt of the existence of the evils at which defendants' plan was aimed. The industry was in distress. It suffered from over-expansion and from a serious relative decline through the growing use of substitute fuels. It was afflicted by injurious practices within itself — practices which demanded correction. If evil conditions could not be entirely cured, they at least might be alleviated. The unfortunate state of the industry would not justify any attempt unduly to restrain competition or to monopolize, but the existing situation prompted defendants to make, and the statute did not preclude them from making, an honest effort to remove abuses, to make competition fairer, and thus to promote the essential interests of commerce. The interests of producers and consumers are interlinked. When industry is

grievously hurt, when producing concerns fail, when unemployment mounts and communities dependent upon profitable production are prostrated, the wells of commerce go dry. So far as actual purposes are concerned, the conclusion of the court below was amply supported that defendants were engaged in a fair and open endeavor to aid the industry in a measurable recovery from its plight." The Appellate Division further adverted to that feature of the decision in which the Chief Justice stated that the stabilization of the industry by the correction of abuses was not necessarily an unreasonable restraint of trade, and it added:

" We are of the opinion that this very recent decision in the *Appalachian Coals* case, in its application of the rule of reason to an honest effort to improve the conditions of industry, holding that the agreement there is entirely legal and proper, affords strong support to the agreement here under consideration."

Plaintiff may argue that the matter of the reasonableness of the restraints in the agreement complained of should be considered at the trial and not upon the pleadings. Nevertheless, I am treating with these matters because *prima facie* the agreement speaks of the ideal of eliminating sub-standard conditions. It also implies an effort to alleviate labor problems, particularly in times of unemployment. In fact the issue of unreasonableness as applying to a class plaintiff has in no way tendered. If the machinery for arbitration or adjustment has been oppressively employed by individuals entrusted with its operation, plaintiff has a full and adequate remedy. To attempt to nullify so important a contract, involving its tens of thousands of workers and hundreds of employers, in order to redress what is claimed merely as an individual wrong, is not in the public interest. Since, presumptively, it would seem that the agreement is designed to stabilize industry and its labor conditions, the court is fully justified in refusing to entertain this action for a declaratory judgment.

The motion for judgment on the pleadings must therefore be granted.