THE MANHATTAN STORAGE & WAREHOUSE COMPANY and LINCOLN WAREHOUSE CORPORATION, Plaintiffs, *v.* MOVERS & WAREHOUSE-MEN'S ASSOCIATION OF GREATER NEW YORK, INC., THE CITY MOVERS ASSOCIATION, INC., UPPER NEW YORK MOVERS ASSOCIATION, INC., and JOSEPH SCHORR, as President, and JOHN J. McKENNA, as Secretary-Treasurer, of Local 814, International Brotherhood of Teamsters, Chauffeurs, Stablemen & Helpers of America, an Unincorporated Association, Consisting of More Than Seven Members, Affiliated with the American Federation of Labor, Defendants.

First Department, June 27, 1941.

*James D. Wise* of counsel [*George J. Kraft* and *Robert M. Bozeman* with him on the brief], *Dean, King, Smith & Taylor,* attorneys for the plaintiff The Manhattan Storage & Warehouse Company.

*Wright, Gordon, Zachry, Parlin & Cahill,* attorneys, for the plaintiff Lincoln Warehouse Corporation.

*David Brodsky* of counsel [*J. Almyk Lieberman* and *Bernard Reich* with him on the brief; *Brodsky & Lieberman,* attorneys], for the defendants Movers & Warehousemen's Association of Greater New York, Inc., City Movers Association, Inc., and Upper New York Movers Association, Inc.

*Harry Sacher,* for the defendant labor union.

CALLAHAN, J. Plaintiffs are stock corporations engaged in the business of moving and storing household goods. Defendant associations are membership corporations, whose members are engaged in the same business. Defendant Local 814 is a labor union, whose members are employed in the industry.

A large part of the moving and storage business in the city of New York is handled by member firms under a written agreement which is the subject of the present dispute. In percentages it is stipulated that thirty-five per centum of all firms in the industry in the boroughs of Manhattan and the Bronx are subject to this agreement, and forty-six per centum of the moving vans in operation in such boroughs are controlled by such firms.

Labor represents a substantial portion of the cost of the services rendered by the industry, ranging from twenty-five per centum to sixty per centum in the various branches of the business.

An agreement was entered into between the union and the defendant associations on April 15, 1940, which, in addition to fixing a scale of wages for union employees, recited that chaotic and cut-throat competition was impairing the ability of the industry to maintain a fair and decent wage scale for its employees. The parties agreed that certain " unfair trade practices " were to be eliminated from the industry. Among those practices was one described as follows: " (e) Quoting or obtaining or attempting to secure a price for any service which shall be less than the sum of the wages necessary under Section I of the Agreement and of reasonable items of expenses and overhead entering into the cost of operation." The agreement provided for the creation of a moving and storage stabilization committee. This committee was authorized to obtain from employers and from other sources reports of operating costs as a basis of preventing unfair practices. It was permitted to prescribe the form of bids and was to be advised of all quotations and estimates. The committee was given the power to exclude from any rights under the agreement any employer who failed to comply with a decision of the committee. It will thus be seen, despite the thinly veiled attempt to conceal the real purpose, that under this agreement the stabilization committee was authorized to fix prices to be charged in the industry.

The plaintiffs herein contend that the agreement is in violation of the anti-monopoly law of this State (Gen. Business Law, § 340), and have refused to abide by it. The defendant union has threatened a strike because of such refusal.

Section 340 of the General Business Law provides, in substance, that every contract, agreement, arrangement or combination whereby a monopoly in the marketing or sale in this State of any

article or service used in the conduct of the trade is or may be created, or whereby competition or the exercise of any activity in this State in the marketing or sale, or in the supply or price of any service is or may be restrained or prevented, or whereby, for the purpose of creating a monopoly or interfering with the free exercise of any activity within the State in the sale of any article or service, the free pursuit in this State of any lawful business is or may be restricted or prevented, is declared to be against public policy, illegal and void.

The moving and storage of goods is unquestionably a trade or business for the marketing of services.

Section 340 of the General Business Law contains exceptions to the effect that the provisions of the law shall not apply (1) to certain co-operative associations, nor to contracts, agreements or arrangements made by such associations; or (2) " to *bona fide* labor unions."

The statute also provides that the labor of human beings shall not be deemed to be a commodity or article of commerce as such terms are used in the section, and that nothing contained in the section shall be deemed to prescribe or restrict the right of working men to combine in unions not organized for the purpose of profit.

The particular question presented is whether by reason of the exemption in favor of labor unions contained in the section, the statute is without application to the present agreement since a labor union is a party thereto.

We had a somewhat similar question presented to us in the case of *New York Clothing Mfrs. Ex., Inc.*, v. *Text. Fin. Assn., Inc.* (238 App. Div. 444). At the time of the decision in that case, however, no exemption was granted in favor of labor unions under the statute, nor did the statute apply to the marketing of services, but only to dealings in commodities. We held in that case that the agreement which involved a scheme to control practices in the cloth sponging industry was not in restraint of trade.

We called attention to the fact that the agreement then under consideration related to " services " which were not attempted to be controlled by section 340 as it then existed. Our decision rested largely on the authority of *Appalachian Coals, Inc.*, v. *United States* (288 U. S. 344), where the Supreme Court of the United States applied the so-called " rule of reason " in determining whether an agreement regulating an industry was monopolistic. Since our decision in the *New York Clothing Manufacturers* case (*supra*) the United States Supreme Court in *United States* v. *Socony-Vacuum Oil Co.* (310 U. S. 150), has held that any agreement which proposes to fix prices is a violation of the Federal anti-trust law *per se*, and

that the so-called " rule of reason " will not be applied to such an agreement.

The Federal anti-monopoly law provides, in effect, that every contract or conspiracy in restraint of trade or commerce is illegal. Its purposes are quite similar to those of our State statute. While it is true that Federal cases interpreting Federal statutes relating to interstate situations are not necessarily controlling on State courts when interpreting their own statutes (*Marsich* v. *Eastman Kodak Co.*, 244 App. Div. 295; affd., 269 N. Y. 621), great weight should be given to the views expressed by the highest court of the land in relation to disputes involving similar issues, particularly issues relating to economic questions. The public policy of our State like that of the nation is opposed to monopolistic practices such as price fixing. This policy has been expressed so often that there is no doubt that an agreement attempting to regulate prices, such as the present contract, would be held in violation of our statute, unless the presence of a labor union as a party exempts the agreement from the State law.

In *Barns* v. *Dairymen's League Co-Operative Assn., Inc.* (220 App. Div. 624) this court held lawful an association of milk producers which included, among its objects, the fixation of prices. We did so because we found that the exemption granted in the statute to the contracts of such associations expressly removed them from the purview of section 340 of the General Business Law.

It will be noted, however, that no express exemption is granted by the section to contracts or agreements of labor unions resulting in monopolies

The ordinary objects of labor unions are well known and have been defined by statute (Civ. Prac. Act, § 876-a; Labor Law, §§ 700–704).

We think that section 340 does not give immunity to the contracts or agreements of labor unions unless they are confined to some legitimate labor activity. To grant labor unions an exemption so that they may enter into agreements to enforce monopolistic aims of employer groups by fixing the prices to be charged the public for services or commodities and thus to stifle competition, would be to destroy entirely the anti-monopoly statutes.

In practically all industries the cost of labor is a substantial part of the price of goods. To say that under the guise of increasing wages or regulating working conditions, a union may be permitted to agree with employers' associations so as to fix the prices which the latter will charge the public for their wares or services is so contrary to the whole purpose of the law that the statute should not be so interpreted unless the language used leaves no room for a contrary construction.

We think that reading section 340 as a whole the exception in favor of labor unions was only intended to protect such unions in their lawful endeavors to secure the interests of working men by agreements with respect to wages, hours or other conditions of labor. It has no relation to contracts fixing prices of goods or services. The social principle which justifies labor unions would be departed from should they become so extended in their operation as to permit the accomplishment of the object here sought.

We find that the same construction was placed on this statute in *De Neri* v. *Louis, Inc.* (174 Misc. 1000) which decision, though modified in part, was affirmed as to the matters material here by the Appellate Division of the Second Department (261 App. Div. 920).

Nor did we hold anything contrary to the views we now express in affirming the decision in *American Fur Mfrs. Assn., Inc.* v. *Associated Fur Coat & Trimming Mfrs., Inc.* (251 App. Div. 708). That case involved an agreement providing that there was to be but one collective labor agreement in the fur industry, a legitimate labor objective.

Of course, an agreement by a labor union fixing wages as such, or contracting with relation to other conditions of employment in which no actual monopoly was involved, would be valid. When, however, the union steps beyond its normal sphere of labor activity and attempts by agreement with employers to fix the prices to be charged for goods or services by a large part of an industry, we think that those agreements come within the prohibition of section 340 of the General Business Law.

Judgment should be directed for the plaintiffs, without costs.

MARTIN, P. J., TOWNLEY and GLENNON, JJ., concur; DORE, J., dissents.

DORE, J. (dissenting). The agreed statement of facts discloses that the number of firms engaged in the moving business since 1929 have been far in excess of demand except at the peak season, and because of this fact the firms resorted to cut-throat competition which caused prices to decline to a level below the cost of such services; that it became a general practice among many firms in the business, in violation of prior contracts with defendant union, to pay their employees rates of pay substantially less than those provided in the contracts between the union and the firms; that some of the employers exacted a " kick-back " from their employees, and others required the employees to work on a so-called " share basis " which gave them a portion of the price obtained for the services rendered and thus enabled such employers to pay rates so low that the wage was a fraction of what the employees were

entitled to under the terms of prior existing agreements; that as a result, fictitious arrangements to give employees the status of independent contractors were made, thus avoiding the State and Federal laws respecting workmen's compensation, social security and unemployment insurance taxes; and that the conditions brought about widespread unemployment among union employees and resulted in the payment of wages less than a living wage.

The submission further stipulates that the only means known for performance of the agreements between the union and the employers was to establish prices for services that would be equal to the cost of rendering such services, and that as a result the agreement in question was made, requiring employers to render services for a price not less than the cost, and that conditions in the industry have been consequently alleviated.

Section 340 of the General Business Law, making illegal and void contracts for monopoly or in restraint of trade, provides: " 2. The provisions of this article shall not apply to cooperative associations * * * of farmers, * * * or dairymen, * * * nor to contracts, agreements or arrangements made by such associations, nor to *bona fide* labor unions. 3. The labor of human beings shall not be deemed or held to be a commodity or article of commerce as such terms are used in this section and nothing herein contained shall be deemed to prohibit or restrict the right of workingmen to combine in unions, organizations and associations, not organized for the purpose of profit."

The foregoing provisions have been construed to exempt all agreements of *bona fide* labor unions from the provisions of subdivision 1 of section 340. (*American Fur Mfrs. Assn., Inc.*, v. *Associated F. C. & T. Mfrs., Inc.*, 161 Misc. 246; affd., 251 App. Div. 708.) In the *American Fur Manufacturers* case the Special Term expressly ruled that the amendment of 1933, adding to the clause " The provisions of this article shall not apply * * * " the words " nor to *bona fide* labor unions," meant that all the provisions of the article were inapplicable and that labor unions were given the same preferential treatment as the other co-operative associations mentioned in subdivision 2, for otherwise the addition of the amendment would be unnecessary and futile, since before the amendment the common law was sufficient so far as union organization was concerned and no legislative act could have made it more effective. While the unanimous affirmance in this court was without opinion, that ruling of the Special Term was not dictum but was the very *ratio decidendi* of the whole case, and in view of the great importance of the question, it is unlikely this court would have affirmed without comment if it considered wholly unsound the ruling that the

collective agreement there attacked was cloaked with immunity by virtue of the amendment exempting labor unions.

*Barns* v. *Dairymen's League Co-Operative Assn., Inc.* (220 App. Div. 624) sustained as lawful a milk producers' association that had among its objectives the fixing of prices.

It is admitted that the exemption of labor unions in section 340 was intended to protect them in lawful endeavors to secure the interest of the workingman by agreements as to wages, hours or other conditions of labor, and that a union agreement fixing such wages or other conditions of employment in which no actual monopoly is involved would be valid. But the submission before us stipulates as a fact that the only means known in this industry to secure the payment of the union wage or a living wage was to establish minimum prices equal to the cost of rendering the services.

The agreement does not prevent competition but sets up standards of fair competition, merely excluding limitless free cut-throat competition based on the rendition of services below cost. To secure compliance with the provisions against charges for services below such cost, it has set up machinery for the registration of estimates and contracts.

There is no evidence before us that market prices or the public interest has been adversely affected, and the agreement does not purport to set up any monopoly prohibited by the common law or the Donnelly Act. In *New York Clothing Manufacturers' Exchange, Inc.,* v. *Textile Finishers Association, Inc.* (238 App. Div. 444), the controversy involved an agreement among defendants doing eighty per cent of the business in question; the agreement fixed on the basis of actual cost the minimum prices to be charged; this court, pointing out that the agreement was one for the rendition of services (and concededly the word " services " was not then contained in the act), nevertheless, quoted with approval the statement in *Barns* v. *Dairymen's League Co-Operative Assn., Inc.* (*supra,* at p. 640): " Before it [the court] will condemn, there must appear the elements of injury to the public, or monopolistic control of a particular article of commerce, or unreasonable interference with and damage to the business of an individual, or the doing of illegal or unconscionable acts, or specific intent to do injury to some one else, or, in brief, at least some of the circumstances which would lead a court in good conscience to say that a given set of defendants were overstepping the bounds of reasonable ambition and fair play and were becoming a nuisance to their fellow men."

In the *New York Clothing Manufacturers' Exchange* case we also quoted with approval the following statement of Justice HUGHES

in *Appalachian Coals, Inc.,* v. *United States* (288 U. S. 344): "In applying this test, a close and objective scrutiny of particular conditions and purposes is necessary in each case. Realities must dominate the judgment. The mere fact that the parties to an agreement eliminate competition between themselves is not enough to condemn it."

Immediately after our decision in the *New York Clothing Manufacturers' Exchange* case (*supra*) the Donnelly Act was amended to include " services " held excluded by this court from the operation of the act. But it is significant to note that the Legislature made no attempt to amend the act to exclude the application of the rule of reason applied by this court to combinations alleged to be in restraint of trade.

Here, only seventeen per cent of the firms engaged in the industry in New York city are subject to the agreement, doing twenty-six per cent of the moving business and owning forty-nine per cent of the storage places, and the rules promulgated permit a member on consent of the stabilization committee to meet on occasion the below minimum prices of independent movers and warehousemen.

If *United States* v. *Socony-Vacuum Oil Co.* (310 U. S. 150) be construed as overruling the *Appalachian Coals* case (*supra*), it is not incumbent upon the courts of this State to abandon their consistent application of the rule of reason. A Federal decision contrary in principle is not binding upon us in respect of a State statute not involving a Federal question. (*Marsich* v. *Eastman Kodak Co.,* 244 App. Div. 295; affd., 269 N. Y. 621.) The holding in the *Socony-Vacuum* case that the rule of reason has no application appears to be clearly contrary to previous decisions of the Supreme Court of the United States. (See *Cement Mfrs. Assn.* v. *United States,* 268 U. S. 588; *Chicago Board of Trade* v. *United States,* 246 id. 231, and *Appalachian Coals, Inc.,* v. *United States,* 288 id. 344.)

On the facts, too, the cases can be distinguished. In this case no specific price is fixed but minimum prices are agreed on based upon the actual cost of services, and it is stipulated that the schedule of basic costs was on the average not higher than the rates and charges for the same services filed by the employers subject to the collective labor agreement with the Interstate Commerce Commission and the Public Service Commission of the State of New York pursuant to Federal and State statutes. Each mover and warehouseman may charge any price above basic costs.

In the *Socony-Vacuum* case the system the defendants employed involved buying up all the supplies. There is no such fact involved in this case. Finally, in the *Socony-Vacuum* case the rights of labor were not involved.

In the same term in which the Supreme Court of the United States decided the *Socony* case, that same court said in *Apex Hosiery Co.* v. *Leader* (310 U. S. 469, 503, 504): "Furthermore, successful union activity, as for example consummation of a wage agreement with employers, may have some influence on price competition by eliminating that part of such competition which is based on differences in labor standards. Since, in order to render a labor combination effective it must eliminate the competition from non-union made goods, see *American Steel Foundries* v. *Tri-City Central Trades Council*, 257 U. S. 184, 209, an elimination of price competition based on differences in labor standards is the objective of any national labor organization. But this effect on competition has not been considered to be the kind of curtailment of price competition prohibited by the Sherman Act. [Citing cases.]"

The *Socony-Vacuum* case was decided under the Sherman Anti-Trust Law. The court decided that a price-fixing agreement violated that law regardless of its good intention. That decision is obviously not controlling here where the court is only asked to determine that the 1933 amendment of our State statute exempts minimum price provisions in a labor agreement from the Donnelly Anti-Trust Act, if such provisions are designed in good faith to establish and maintain wage, hour and working conditions in a *bona fide* collective bargaining agreement. The Sherman Act contains no provisions for the exemption of labor unions and yet, as indicated above, curtailment of price competition was not regarded as a violation of the act where it resulted from an elimination of price competition based upon differences in labor standards.

The minimum prices here concerned are stipulated to agree with the actual costs.

It is stated in the majority opinion that the agreement under "thinly veiled" language authorizes the stabilization committee to fix prices, and also that under the "guise" of increasing wages and regulating working conditions, the aim is to fix prices. The words indicate the opposite of *bona fides* and apparently suggest an ulterior and sinister object. But there is nothing whatever in the stipulated facts to justify such suggestions or to show that the arrangement before us was a subterfuge and not a *bona fide* activity of the labor union in furtherance of its natural and proper objects. . The immunity granted by the Donnelly Act is restricted to a *bona fide* labor activity. When in a proper case the facts show that the agreement is not *bona fide* but merely a subterfuge and device to enable employers to fix prices, I entirely agree that the agreement would not be within the immunity of the exemption. But the stipulation of facts accepted by this court establishes the good faith of this contract.

The union by joining the contract aims to protect labor and to further its legitimate purposes as to wages, hours and working conditions. The employer joins the contract so as to be enabled to fulfill its collective agreement with the union and to correct the ruinous abuses named in the contract (a part of this stipulation) which were indisputably shown to follow from limitless, free, unrestrained, cut-throat competition. There is no evidence before us that the agreement has affected market prices.

This agreement recognizes the vital interest of employers, employees, and the public in the maintenance of fair trade practices in this industry, and the elimination of the disastrous and ruinous consequences not of fair competition but of cut-throat competition below the cost necessary to pay a living wage. Such voluntary co-operative effort between business and labor should not be struck down by the courts unless the law expressly forbids. Here the statute expressly exempts.

Judgment should be directed for defendants sustaining the validity of the agreement and adjudging that plaintiffs are bound by its terms and provisions.

Judgment directed in favor of the plaintiffs, without costs. Settle order on notice.