Nathaniel T. Helman, J.
Motions numbered 176,177 and 178 are consolidated for disposition herein.
They are motions made before answer by defendants for judgment pursuant to CPLB, 3211 '(subd. [c]). The Attorney-General cross-moves for like relief.
The Attorney-General brings this action for an injunction and penalties against the Association of Contracting Plumbers of the City of New York (Association) and certain of its officials and members to enforce and secure antitrust compliance under the Donnelly Act (General Business Law, §§ 340, 342, 342-a). The Attorney-General charges that defendants and their Association in a combination have entered into contracts, agreements and arrangements whereby ‘ ‘ [c] ompetition or the free exercise of any activity in the conduct of any business trade or commerce or in the furnishing of any service in this state is or may be restrained.” That these alleged illegal contractual arrangements are evidenced in the defendants’ Association’s by-laws, resolution and labor agreement; to wit: (1) to boycott the State University Construction Fund (SUCF) contracts let by single contracts for all the work to be performed and to force owners to let contracts by separate contracts, so as to eliminate com *258 petition by negotiations for lower prices between owners; (2) to eliminate negotiations for lower prices and to tamper with pricing practices between owners, general contractors, and plumbing contractors; (3) to prohibit advertisements in publications except those of organizations in which the Association holds membership; (4) to prohibit use or installation of plumbing materials, fixtures or articles not first purchased by members from the manufacturer or dealer and by him sold to the owner or contractor.
Plaintiff has withdrawn without prejudice its challenge to the Association’s by-laws enumerated in article IV, paragraph 5; and article V, paragraphs 1, 2, 3. Specifically the Attorney-General charges that defendants and their Association’s action and decision that “ plumbing contractors * * * should not partcipate in any arrangement that does not provide for such separate bid and separate contract” is an illegal agreement, arrangement and combination to boycott, to coerce the SUCF to comply with their demands and let contracts by separate contracts, in violation of the Donnelly Act. On June 19, 1962, it was reported at a membership meeting of the Association that “ many questions as to whether or not association members could refrain from submitting bids on a job known as The Downstate Medical Center, recently advertised by the aforementioned (New York State University) construction fund under a single contract ” had been considered. The following action was then adopted by majority vote of the members of the defendant Association.
“ The principle embodied in separate bidding, separate contracts provision of the law is in our view a sound and equitable one; the efforts made to break down that rule are not in our interests or for the public benefit. A recent amendment permits a state agency to ignore separate bidding, separate contract, in its discretion.
“In our opinion, plumbing contractors should insist on separate bidding and separate contracts and should not participate in any arrangement that does not provide for such separate bid and separate contract.”
The minutes of the June 19 meeting were read and affirmed at the regular membership meeting on September 18, 1962.
The trustees of SUCF were given the discretionary power in contracting for State University construction to specify the use of single rather than separate contracts (Education Law, §§ 370-384). They designated the Downstate Medical Center as the first project on which the work would be contracted and bid on a single contract basis. It is this action which seemingly *259 triggered the meeting of June 19,1962, at which proposals were adopted, claimed by the Attorney-General as illegal actions. The Attorney-General points out that some of the members “ reasoned that they did not feel the Association should be on record as refusing to bid on any job.” Furthermore, it was then decided that ‘ ‘ plumbing contractors * * * should not participate.” It is thus argued that a group boycott to refrain from bidding involving each participant’s surrender of economic benefits and profits was established, necessarily contemplating mutual assurances of co-operation.
Defendants state that such action was with respect to a public issue to which they were constitutionally entitled to assemble and speak, and that the Attorney-General has given a strained and sinister meaning thereto without any such intention; that there were no concealed refusals to bid under single contracts and no boycott of single-contract projects. The Association believed that the single-contract provision in the State Education Law is contrary both to public policy expressed in basic law and to the public good. That they expressed in an opinion, which they claim is all the resolution amounted to, as to the policy which plumbing contractors should pursue in reference to this public matter. Under the head of advocacy, the Association claims its right to petition the Legislature, to influence public agencies to adhere to the separate-contract system and to recommend that contractors insist on separate bidding. The question must come down to whether the action of the defendants was, in fact, an agreement to refrain from participating in public work on any other basis.
Thus, plaintiff states that there was a boycott initiated and carried out by the defendants against general contractors because of the position taken by the defendant trade association in adopting the resolution on June 19, 1962 and other activities by defendants. Defendants deny any such intention and allege facts disputing the alleged boycott. The acts of defendants must be considered in the light of all the surrounding circumstances so as to determine the true meaning to be attributed to defendants’ conduct. The alleged conspiracy must be judged by viewing it in its entirety and not by dismembering and viewing its separate parts.
The court will not infer and presume facts which it is the burden of plaintiff to demonstrate with such clarity as would justify a directed verdict.
Whether there was actionable conduct within the ambit of the Donnelly Act is a matter for trial.
*260 Another of the Association’s by-laws, which the Attorney-General complains of herein, pertains to advertising. It reads: “ No member shall advertise in programs, engineers’ or architects’ handbooks, nor in publications of societies, churches or church fairs, nor in kindred publications except programs or publications of organizations in which this association holds membership; and no member shall advertise in conjunction with or participate in any advertisement of a building by its owner or operator.”
Defendants contend that it is limited in scope and for the protection of the members of the Association. That it is a manner of protecting the membership from an imposition they wish to be free of, or to give them an “ out ” when approached for such advertising. That it was adopted because subcontractors were constantly being besieged by builders, general contractors, unions and others to attach their names to advertisements and to pay a portion of the advertising costs. Contractors were ■ being asked to take pages of handbooks, programs, etc. That to avoid embarrassment and expense, the members of the Association adopted the by-law in question.
It is true that advertising is an element or form of competition and it may be that any agreement among competitors to refrain from legitimate and truthful advertising restricts competition. However, defendant has a right to establish that .the procedure adopted was intended to avoid embarrassment and expense to its members and served no other purpose.
Whether the advertising by-law is an illegal device to lessen competition, creates a monopoly, or interferes with the free exercise of business, trade and commerce in the building construction industry in the State of New York is a matter for trial.
A further by-law of the Association attacked herein is the bidders registry by-law promulgated and adopted in 1959 and discontinued on December 8, 1967, over two years after the institution of .this action. The by-law pertaining thereto 'states that “ In general, the Bidders Registry shall consist of a system of reporting and recording the names of prospective bidders and the successful bidders for every job, including notifying each prospective bidder of the names of the other prospective bidders, and making available the name of the prospective bidders to all determined by said Committee to be properly interested.”
The Attorney-General contends that the bidders registry is an arrangement to eliminate price competition; that under the by-law each member ‘ ‘ within three calendar days, after an *261 invitation to bid on a job, and in any event not less than seven (7) calendar days before a bid is submitted * * * shall notify the executive secretary * * * the following data: a description of the job — the name of the firm organization or agency inviting the bid — the date the invitation to bid was received — and the final date and the time of day the bid must be submitted.” The executive secretary is required to “ record the date ” and to “ distribute only to prospective bidders * * * a list of all prospective bidders * * * and the first date and, the day for the submission of the bid, and supplements thereto, if necessary.”
The by-law is not optional, but mandatory, and provides for penalties for noncompliance therewith. The State contends that the by-law has an anticompetitive effect by its removal of competition through the elimination of negotiations for lower prices by various devices. Thus no member can bid unless he registers seven days in advance of the date his bid is due; nor can he bid prior to receipt of the list of other contractors who report solicitations and negotiations for lower prices; nor can he bid upon the receipt of information where the executive secretary has exposed the existence of competition by solicitations and negotiations for lower prices, which he demonstrates by indicating a “ gap ” in time; by setting the “ final date ”. The circulation to competitors of the identity of any .member who participates in negotiations for lower prices also serves as an enforcement device to secure compliance.
Defendant argues that lacking any reference to price in the bidders registry, no violation of the antitrust laws exists. (United States v. Bakersfield Assoc. Plumbing Contrs. C.C.H. 1958 Trade Cases, par. 69087 [U. S. Dist. Ct., S. D. Cal., 1958].) It is, of course, true that trade association members who agree to eliminate competition among themselves, do not, by such understanding, necessarily violate the antitrust laws. The plain purpose and intent of the bidders registry, however, is to cut off solicitations and negotiations for lower prices with owners, thus eliminating competition. Its function was thus described by one of its representatives “ to indicate the competition to be expected on any job — would prevent rebidding of the same job — would prevent additional bid-shopping after the original bids were taken * * * if it is known that there are 14 or 15 bidders for a certain job many might feel they did not wish to submit a bid.” Inevitably, circulation of the identity of bidders and final date, plus disclosure of the identity of “ late ” registrants, would result in pressures and sanctions, which would affect bid prices. Such procedures have frequently been *262 criticized as illegal restraints of competition, and monopolization. (People v. Knight, 202 App. Div. 742; Eastern States Lbr. Assn. v. United States, 234 U. S. 600.)
The discontinuance of the bidders registry in December 1967, does not absolve defendants from an injunction. Since a violation has been established the courts have an obligation to protect the public from a continuation of the harmful and unlawful activities. (Trade Comm. v. Goodyear Co., 304 U. S. 257, 260; United States v. Parke, Davis & Co., 362 U. S. 29, 48.) A permanent injunction is granted on this branch of the action.
Another by-law challenged as a violation of the Donnelly Act is the Association’s 1901 by-law, allegedly shifted to its labor agreement which prohibits the use or installation by a member of plumbing materials, fixtures or articles not first purchased by him from the manufacturer or dealer and by him sold to the owner, or his agent or contractor employing him.
The by-law reads: “ Section 1. A member of this Association, shall not, without the consent of the Association, use upon any work, job or contract he may engage upon, any new plumbing materials, fixtures or articles not first purchased by him from the manufacturer or dealer by him sold to the person, agent or contractor employing him. ’ ’
The labor agreement contains the following clause: “ All the apparatus, fixtures and materials enumerated above and all apparatus, fixtures and materials used in connection therewith must have been purchased and furnished by^the employer having the contract for the installation of the same ”.
Affidavits have been submitted by the union representatives that the “ fixture ” clause was enacted in the collective bargaining agreement at the insistence of the union, that it was designed for the benefit of the union members so as to guarantee to the extent possible that only journeymen engaged in plumbing work can install the piping and equipment, rather than have such installation made by others.
It is clear that the 1901 by-law violates the Donnelly Act provisions by restraining competition, and the free exercise of business, trade and commerce. There is an obvious direct interest in the profits derived from these sales and furnishing of plumbing equipment to the building owners. The Attorney-G-eneral contends that the 1901 by-law was shifted to the labor agreement in an apparent attempt to immunize the illegal agreement. Defendants claim immunity because of bona fide labor union exemption in the Donnelly Act. As to this contention, Falciglia v. Gallagher (164 Misc. 838) clearly states the rule. *263 That case held that the Legislature had no intention of giving immunity and sanctity to union activities designed not to further the ends of labor, but to advance the monopolistic area of employer groups in their effort to stifle competition and, furthermore, that the Legislature would be without power to enact such legislation. The protection for labor unions given by the 1933 amendment aforesaid (bona fide union exemption) was intended to permit the labor unions to fix labor wages, hours of employment, etc., by agreement without violating the statute.
Although the statute is “ by its terms, wholly inapplicable to the formation and activities of a bona fide labor union * * * the proscriptions of the statute are applicable to activities, even on the part of such unions, in aiding nonlabor groups to violate the same ” (Reinman v. Jaffe, 280 App. Div. 837). (See, also, State of New York v. Milk Handlers & Processors Assn., 52 Misc 2d 658, affd. 28 A D 2d 971.)
Provisions in labor agreements effecting a monopolization of the marketing of goods to the employers have been condemned as illegal (Allen Bradley Co. v. Union, 51 F. Supp. 36, red. 145 F. 2d 215, red. 325 U. S. 797). “ Congress never intended that unions could * * * aid non-labor groups to create business monopolies and to control .the marketing of goods and services * * * For if business groups, by combining with labor unions, can fix prices and divide up markets, it was little more than a futile gesture for Congress to prohibit price fixing by business groups themselves.” (Allen Bradley Co. v. Union, supra, pp. 808, 810).
New York courts have consistently held that labor unions participating in anticompetitive practices, fall within the scope of the Donnelly Act. (Reinman v. Jaffe, supra; Manhattan Stor. & Warehouse Co. v. Movers & Warehousemen’s Assn., 262 App. Div. 332, revd. on other grounds 289 N. Y. 82; Capitol Automatic Music Co. v. International Brotherhood of Elec. Workers, N. Y. L. J., June 3, 1939, p. 2561, col. 6, affd. 258 App. Div. 874.)
Even assuming that the challenged agreement was inserted at the insistance of the union, such contention would offer no defense to the Association (United States v. Fish Smokers Trade Council, 183 F. Supp. 227, 235-236; State of New York v. Milk Handlers and Processors Assn., supra). However, the challenged clause in the labor agreement cannot be acted upon in the absence of the union as a party herein. "Whether the challenged provision is in furtherance of legitimate and proper union objectives can best be determined if the union is made a party. The views here expressed relate only to the alleged *264 participation of the defendant in a program apparently designed to provide profit to a limited group of manufacturers, so as to impose higher costs upon building owners.
Defendants’ motion is denied, and plaintiff’s motion is granted to the extent indicated herein.