A. Franklin Mahoney, J.
Chapter 1095 of the Laws of 1971, effective July 2, 1971, amended section 38 of the Pari-Mutuel Revenue Law (L. 1940, ch. 254, as amd.) governing the period during which harness racing may be conducted in this State. Under the amended law the Harness Racing Commission was authorized, in counties having a population of 250,000 or less, to permit harness racing during the period from December 15 of one year and January 8 of the following year, excluding December 25 (a period heretofore proscribed under unamended section 38 of the Pari-Mutuel Law), if the Commission is satisfied that a 11 special occasion ’ ’ made the conduct of harness racing on such days proper or necessary.
The text of the amendment is as follows: “ In counties having a population of two hundred fifty thousand or less, the state harness racing commission may, however, permit the holding of one or more harness horse race meetings and the conduct of harness races at such meetings on a day or days not during such period if the commission is satisfied that a special occasion makes the holding of such meetings and the conduct of such races on such day or days proper or necessary; but in no event shall such meetings or races be held or conducted on the twenty-fifth day of December. ’ ’
Petitioner, Sullivan County Harness Racing Association, Inc. (hereinafter referred to as Montieello) made application to the New York State Harness Racing Commission (hereinafter referred to as Commission) for racing dates pursuant to amended section 38 of the Pari-Mutuel Revenue Law, and was licensed on September 8, 1971 to conduct racing, in conjunction with the Sullivan County Winter Carnival, from December 15, 1971 to January 8, 1972. Thereafter, Montieello entered into negotiations with New York City Off-Track Betting Corporation (hereinafter referred to as OTBC), resulting in a contract on October 6, 1971 for the live telecasting of the last race of each evening from December 15, 1971 to January 8, 1972, inclusive, as well as the taped telecast of two prior races. Monticello and OTBC also executed a second agreement providing for the interfacing of OTBC off-track wagers with those accepted at the track into a single pari-mutuel pool, all pursuant to section 69-a of the Pari-Mutuel Revenue Law, as added by chapter 143 of the Laws of 1970. These agreements were filed with the Commission pursuant to section 44-a of the Pari-Mutuel Revenue Law (L. 1940, ch. 254, as amd. by L. 1954, ch. 5, § 4 *581 and L. 1954, eh. 510 § 6). The filing of the contracts alerted other harness track operators around the State to the contents of the agreements; and Yonkers Raceway and Roosevelt Raceway, in a single application, formally petitioned the Commission to reconsider its allocation of winter racing dates to Monticello. Thereafter, on October 14, 1971, the Commission conducted a hearing at which many and varied interests were represented, including all of the other seven harness tracks in the State, and on November 18, 1971 the Commission rendered a written decision reviewing the testimony[1] it heard at the October 14 hearing and concluded that its action of September 8, 1971, granting Monticello winter racing dates, should be amended to include the condition that Monticello not conduct its racing program from December 15, 1971 to January 8, 1972 in conjunction with any television broadcasts. Monticello, along with OTBC as a petitioner-intervenor, seeks review of the Commission’s November 18, 1971 ruling, to the end that it be judicially declared to be arbitrary, capricious and/or illegal in that the condition imposed is beyond the powers of the Commission.
Before reviewing the decision it would be helpful to narrow and refine the issue that is disruptive of the professional co-operativeness that heretofore existed among all the harness tracks in this State. Is the evil complained of by all the respondents the telecasting of racing, or is it the telecasting of racing in a manner that might inure to the benefit of OTBC, the common enemy of all tracks, including Monticello 1 It is undeniable that Yonkers Raceway, Roosevelt Raceway, and Saratoga Raceway have all in the past contracted with television stations for public telecasting of the sport as conducted at their respective plants. Presumably, these contracts were filed with the Commission and that body placed no condition or limitation on their right to conduct racing in conjunction with television. Further, the whole tenor of the oral arguments, at Special Term, in opposition to the petition, was not addressed to the deleterious effect of television per se but, rather, to television in co-operation with OTBC. In my view, this is an important refinement. Harness racing, thoroughbred racing, the OTBC, and pari-mutuel betting, are all creatures of the Legislature and each, by statute, was removed from an area considered otherwise to be criminal in order to generate revenues for the State. Looked at in that *582 light it is difficult for the court to conclude that a contractual relationship between any two of these bodies with respect to the objectives for which all of them were created should be considered to be so heinous in nature as to justify the Commission’s conclusion that such a contract would be inimical to harness racing.
However, the Commission reached that conclusion and predicated its findings on the following four reasons: .
“ There are certain aspects to the Monticello-OTB scheme which the commission finds disturbing. First, as a result of the TV broadcasts in New York City, Monticello would be, in effect, racing and competing in an area not designated in its certificate of incorporation and in its license. In so doing, it would also be circumventing the twenty-five-mile restriction contained in the law. Whether or not such conduct, since it would be accomplished indirectly through the device of television, would constitute an actual violation of the Pari-Mutuel Revenue Law is debatable, but it would violate the spirit and intent of the law. Fortunately, the powers of the commission enable it to insure that the spirit and intent of the law be complied with.
‘ ‘ Second, OTB through its partnership with Monticello, would become a direct competitor of Roosevelt and Yonkers in a manner not envisioned in the Off-Track Betting Law. Instead of developing its own market, OTB, with the aid of Monticello, would be directly competing with Roosevelt and Yonkers. Although the Commission has no jurisdiction over OTB in its operations off the licensed harness tracks, it does have jurisdiction over Monticello.
‘ ‘ Third, in the judgment of the commission, upon the evidence before it, the scheme poses a deleterious threat to the industry and to the revenue of the state and the localities. New York, is by far, the foremost pari-mutuel harness racing state in the nation, accounting for between 40% and 50% of the national attendance and handle. The leaders of that industry were unanimous in their opposition to the scheme except for its two proponents. The industry is an important segment of the economic life of the state, providing thousands of jobs directly in its racing operations and through the numerous related businesses. Should the tracks’ revenues decline, the horsemen’s purses and the venue of the Breeding Development Fund, both of which are tied to the track’s revenue, would automatically decline.
‘£ Fourth, Monticello would be operating during the proscribed period in a manner not envisioned by Chapter 1095. Pari-mutuel racing has heretofore been banned during the *583 Christmas-New Year period in recognition of opposing commercial and religious interests. Chapter 1095 represents an exception to the ban. It was sponsored by Monticello at the 1971 legislative session and its clear purpose was to enable Monticello to participate in the year-end winter vacation activities which attract substantial numbers of visitors to the area. It contemplates a local operation away from the major metropolitan centers. In fact, Chapter 1095, by restricting its application to counties having a population of 250,000 or less pointedly removes the Greater New York City area from its application. However, under the Monticello-OTB scheme, offtrack betting in New York City, in conjunction with live television broadcasts, also in New York City, becomes the dominant feature of the operation, far overshadowing the purpose of the new law and the basis for the commission’s original action in granting the winter dates.”
The court shall discuss the above-quoted reasons in the order listed.
Does the television contract between petitioners, which concededly would reproduce in New York City the races run at Monticello, constitute a violation of the 25-mile restriction contained in subdivision 4 of section 40 (as added by L. 1954, ch. 5, § 3, as amd. by L. 1960, ch. 303 of the Pari-Mutuel Revenue Law? In my view, it does not. Subdivision 4 of section 40 so far as appropriate states: “No such license shall be granted to any harness horse race track located within twenty-five miles of any track already licensed” (emphasis supplied). Location means “ spot ”, “ place ” or “ site ”, and the “ spot ”, “ place ” or “ site ” of Monticello Raceway is 90 miles north of Yonkers Raceway and an even greater distance from any other harness track in the State. The Commission itself doubted the applicability of the language of subdivision 4 of section 40 to the facts herein, as evidenced by the following comment: ‘1 Whether or not such conduct, since it would be accomplished indirectly through the device of television would constitute an actual violation of the Pari-Mutuel Law is debatable ”. Clearly, it was the legislative intent to preserve to each of the licensed harness tracks a certain populated area from which to draw its attendance. It did not intend, nor would it be constitutionally permissible, that people outside a designated area could not enter for the purpose of attending a harness track. If the Legislature did not intend to interfere with the free movement of people, either into an area so as to increase attendance or out of an area so as to decrease attendance, can it be said that it intended to *584 proscribe the entry of television pictures into the same area? In my view it did not.
The second reason for the amendment of Monticello’s winter license is that the television agreement would create a market for betting in New York City in direct competition with Yonkers and Roosevelt Raceways. This reason is likewise without merit as a justification of the Commission’s decision. Section 71 of article VI (New York City Off-Track Betting Corporation Law) of the Pari-Mutuel Revenue Law of 1970 (L. 1940, ch. 254, as amd. by L. 1970, ch. 144, § 1), entitled “Declaration of policy and statement of purposes ’ ’, so far as pertinent herein, states: ‘ ‘ 3. That the operation of an off-track pari-mutuel betting system by a public benefit corporation in New York city, in accordance with the provision of the New York state off-track parimutuel betting law, is deemed to be a matter of state concern and a public purpose which cannot be adequately attained except by the powers of government, and that such public benefit corporation in the exercise of the powers conferred upon it by this article, will perform a governmental function.” (Emphasis supplied.) Clearly, it was the Legislature, and not the petitioner herein, that created the competitive climate in New York City between the race tracks and OTBC. Indeed, the Legislature stated that the operation of off-track betting in New York City “ is deemed to be a matter of state concern and a public, purpose ” (§ 71, subd. 3) and that OTBC in furthering that purpose by exercising the powers granted to it, which do not preclude telecasting except in the betting parlors (§ 69-e, as added by L. 1970, ch. 143, § 1), is performing “ a governmental function ”. Further, since New York City is an approved “participating municipality” (§ 68, as added by L. 1970, ch. 143, § 1) the co-operation of the New York City tracks is statutorily compelled by the provisions of section 69-a of the Pari-Mutuel Revenue Law. Paragraph (a) of subdivision 2 of that section states that “At the request of the commission [Off-Track Pari-Mutuel Betting Commission], a track operator * * * shall * * * provide appropriate space and/or facilities at its track whereby the commission may perform the functions hereinafter described with respect to the transmission and reception of bets and racing information”. From all of this statutory language it seems clear that any competitive edginess that exists in the New York metropolitan area was created by legislative fiat and not by the television contract between the petitioners. In any event, both Yonkers Raceway and Roosevelt Raceway will be closed for 18 of the 25 racing dates covered by the allocation of winter dates to Monticello.
*585 The Commission’s third reason for amending its grant of racing dates to Monticello is based on possible decline in track revenues during those dates when telecasting of races from Monticello and racing at either Yonkers or Roosevelt is being conducted simultaneously. Even conceding, arguendo, that this unhappy result should occur, it still does not constitute a premise for revocation or conditioning a license heretofore granted to a proper and fit person (corporation) to conduct a racing meet. Any cursory review of the legislative hearings conducted prior to the enactment of the New York State Off-Track Pari-Mutuel Betting Law [L. 1970, ch. 143, § 1] inescapably leads to the conclusion that the Legislature was well aware of the claims that off-track betting would be ruinous to track operators and would cause a marked decline in State revenues from the sport of racing. The enactment of the law attests to the rejection of these arguments in favor of the view that such a system of off-track betting tied to the operation of New York tracks would reduce organized crime and increase State revenues. Next, in order to provide against any decline in revenues to track operators, the State or participating local governments, the Legislature enacted section 69-b of the Pari-Mutuel Revenue Law which provides for reimbursement for losses sustained by the tracks, the State or local municipalities by the operation of an off-track betting system. The legislative machinery must be permitted to operate even if the Commission holds to the view that such operation will be deleterious to harness racing.
Lastly, the Commission gives as its fourth reason for conditioning the winter dates granted to Monticello, the contention that televising races into the New York area during the period from December 15 to January 8 violates the intent of the amended law permitting such racing in counties of less than 250,000 inhabitants in connection with a special event. The Commission takes the position that the amended law (section 38 of Pari-Mutuel Revenue Law) intended that such racing was to be conducted in a rural atmosphere in connection with some local event and was not to intrude on the public of larger metropolitan areas who, presumably, would refrain from betting or viewing racing during this period which, traditionally, had always been preserved for religious services or contemplation. This contention is suspect on two grounds. First, it ignores the fact that the Legislature, at the time it amended section 38 of the Pari-Mutuel Revenue Law, must have been mindful of the fact that it had authorized off-track wagering by authorized municipalities at all New York tracks, as well as out-of-State tracks, wherever situated and whenever conducted. *586 A fortiori it must have intended to authorize off-track betting at any rural track licensed to conduct harness races from December 15 to January 8. Second, the contention of the Commission carries with it the unholy idea that people in counties of 250,000 inhabitants or less are not as religiously inclined or oriented as their metropolitan brethren or, if they are so inclined, that they will not be distracted from their worship by a harness race meeting. Either ground undermines this fourth reason for amending Monticello’s winter license by conditioning it upon the nullification of the contract to televise.
I have reviewed the provisions of chapter 440 of the Laws of 1926 and chapter 254 of the Laws of 1940, as amended as they relate to Racing (L. 1926, ch. 440, §§ 1-16); Pari-Mutuel Revenue (L. 1940, ch. 254, §§ 1-25-a); Harness Horse Racing (L. 1940, ch. 254, §§ 35-55); New York State Off-Track Pari-Mutuel Betting Law (L. 1940, ch. 254, §§ 65-69-1, as amd. by L. 1970’, ch. 143), and New York City Off-Track Betting Corporation Law (L. 1940, ch. 254, §§ 70-93, as amd. by L. 1970, ch. 144), and find no provision prohibiting any harness race track from contracting to televise its races for promotional purposes, either with a commercial television station or with OTB C. All such contracts, if made, must be filed with the Commission. However, in the absence of illegality or trafficking with elements harmful to racing and to society itself, as evidenced by the filed contracts, the Commission has no statutory authority to interfere with the rights and privileges established by such contracts. This is particularly so when the attempted interference is sought to be justified, as herein, on grounds already preempted by the State. An administrative agency may not grant, revoke, modify or condition a license on a ground not authorized by the statute conferring its power, or suspend or condition a license for a cause not specified or provided in such statute or the valid regulations of the agency. (Matter of Northwestern Nat. Ins. Co. v. Pink, 288 N. Y. 359; Matter of Cherry v. Board of Regents of Univ. of N. Y. 289 N. Y. 148; Matter of Mandel v. Board of Regents of Univ. of State of N. Y., 250 N. Y. 173; Matter of Colonial Liq. Distr. v. O’Connell, 295 N. Y. 129; Matter of Wager v. State Liq. Auth., 151 N. Y. S. 2d 274, affd. 3 A D 2d 934.) No statutory grant of power to the Commission or its own rules and regulations justify the condition imposed by the decision of November 18, 1971. The Commission exceeded its authority and, as a result, its action is declared to be without effect. The condition that Monticello not conduct its winter racing program in conjunction with any television broadcasts is removed.
*587 In reaching this conclusion the court has considered the contention of Mid-State Raceway that the subject contract between the petitioners is unlawful per se in that it is in violation of section 340 of the General Business Law of the State of New York, and rejected it on the ground that section 340 has no application to the facts herein. Section 340 of the General Business Law declares any contract, agreement or arrangement to be illegal and void if it establishes or maintains a monopoly or unlawfully interferes with the free exercise of any activity in the conduct of any business or trade, in this case, the telecasting of races. The subject contract creates no monopoly nor does it purport to cut off solicitation or negotiation by OTB C of similar contractual relationship with other tracks. Each track, if it wishes, is free to negotiate a contract with OTBC on such terms and conditions as it considers satisfactory (People v. Association of Contracting Plumbers of City of N. Y., 57 Misc 2d 256).
The relief sought in the petition is granted.

. The testimony was unsworn and, further, because of mechanical breakdown of the stenographic machine the testimony of the representative of Monticello and OTBC as well as Mr. Levy of Roosevelt Raceway was not preserved. In my view, the hearing was not statutorily mandated, was advisory in nature, and does not lend itself to the substantial evidence rule of CPLR 7804.